# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

---

| | |
|---|---|
| **DILIGENCE MARITIME, LTD.,** | **CIVIL ACTION NO:** _____ |
|                        **Plaintiff,** | **DISTRICT JUDGE** |
|    **vs.** | _____ |
| **AGRIBUSINESS UNITED SAVANNAH LOGISTICS, LLC; AGRIBUSINESS MULTI-MODAL COMMODITIES, INC.; AGRIBUSINESS UNITED NORTH AMERICA, INC.; AGRIBUSINESS UNITED DMCC; and AGRIBUSINESS UNITED AFRIQUE S.A.R.LAU** | **MAGISTRATE JUDGE** _____ |
|                  **Defendants.** | |

---

## PLAINTIFF'S VERIFIED COMPLAINT

Plaintiff Diligence Maritime, Ltd. ("**Dililgence**" or "**Owners**"), complaining of Defendants Agribusiness United Savannah Logistics, LLC ("**AU Savannah**"), Agribusiness Multi Commodities, Inc. ("**AU Multi**"), Agribusiness United North America, Inc. ("**AU North America**"), Agribusiness United DMCC ("**AU Dubai**"), Agribusiness United Afrique S.A.R.LAU ("**AU Afrique**") (collectively "**Defendants**") allege and say as follows:

### I.  Parties and Jurisdictional Allegations

1.      This is an action in admiralty, designated as such in accordance with Fed. R. Civ. P. 9(h) and for which subject matter jurisdiction is provided by 28 USC § 1333(1).  The claims asserted are, *inter alia*, for maritime attachment and garnishment under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, to secure payment of a foreign

attachment award under Section 8 of the Federal Arbitration Act, 9 U.S.C.A. §1 *et seq.* (the "**FAA**").

2.      Plaintiff is a corporation organized and existing under the laws of the Commonwealth of the Bahamas.

3.      Plaintiff is the Owner of the M/V AEC DILIGENCE, an oceangoing bulk carrier of 31,642 deadweight tons registered in the Bahamas and bearing IMO. No. 9249025 (the "**Vessel**").

4.      Defendant AU Savannah is a limited liability company organized under the laws of Florida with its principal place of business located at 2 East Bryan Street, Suite 1150, Savannah, Georgia, 31401. Defendant cannot be found in this district but, upon information and belief, has property in the district subject to maritime attachment and garnishment under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

5.      Defendant AU Multi is a corporation organized and existing under the laws of the State of Georgia with its principal place of business located at 2 East Bryan Street, Suite 1150, Savannah, Georgia, 31401. Defendant cannot be found in this district but, upon information and belief, has property in the district subject to maritime attachment and garnishment under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

6.      Defendant AU North America is a corporation organized and existing under the laws of the State of Georgia with its principal place of business located at 2 East Bryan Street, Suite 1150, Savannah, Georgia, 31401. Defendant cannot be found in this district but, upon information and belief, has property in the district subject to maritime attachment and garnishment under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

7.      Defendant AU Dubai is a corporation organized and existing under the laws of the United Arab Emirates or other foreign country.  Defendant cannot be found in this district but, upon information and belief, has property in the district subject to maritime attachment and garnishment under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

8.      Defendant AU Afrique is a corporation organized and existing under the laws of the Kingdom of Morocco or other foreign country.  Defendant AU Afrique cannot be found in this district but, upon information and belief, has property in this district subject to maritime attachment and garnishment under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

9.      Upon information and belief, Defendants are alter egos of one another, as (1) the stockholders' disregard of the separation of the corporate entities made these Defendants a mere instrumentality for the transaction of their own affairs, (2) there is such unity of interest and ownership that the separate personalities of the corporate entities no longer exist, and (3) to adhere to the doctrine of separate corporate entities would promote injustice or protect against fraud.

10.     This Court has jurisdiction over the Defendants to the extent that they have property in the District and as such venue is proper.

## II.  Factual Allegations

11.     On or about June 25, 2015, Plaintiff entered into a voyage charter party with Defendant AU Savannah, in which AU Savannah agreed to charter the Vessel for a voyage from the Mississippi River to Portugal and then on to Casablanca, Morocco.  The charter party is a standard form Baltic and International Maritime Council ("**BIMCO**") Uniform General Charter

3

with a recapitulation by email between the parties and/or their agents of certain negotiated terms (the "**Recap**").  Together, the BIMCO Uniform General Charter and the Recap constitute the complete "**Charter Party.**"

12.     The Charter Party is a maritime transaction for purposes of Section 1 of the Federal Arbitration Act, 9 U.S.C.A. § 1, *et seq.*  A true and accurate copy of the Charter Party is attached hereto as **Exhibit "A."**

13.     The Charter Party Recap provides that the performance of Defendant AU Savannah's obligations thereunder is "**Fully guaranteed by Agribusiness United DMCC, Dubai UAE [AU Dubai]**."  (Emphasis in original).

14.     The Charter Party at clause 19(a) required any disputes arising thereunder to be resolved according to English law by arbitration in London.

15.     The Charter Party at clause 5(c) provides the "Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores."

16.     The Charter Party at clause 7 holds Charterers liable for the payment of demurrage.

17.    The Recap also provides, in relevant part, as follows:

Clause 24
Out Turn Weight and Shortage Claims

If the vessel discharges are more than one discharge port then the vessel not to responsible for the split of cargo out turn for each individual port but only for the overall out turned quantity.  It is further agreed that in case of the vessel discharging in North African ports including but not limited to Morocco, Algeria, Tunisia and Egypt then **the Owners shall not be responsible for short landing claims whatsoever.  In the event that the Owners this clause not withstanding should be required to provide a bond or other security in order to prevent delay or arrest of the vessel or to secure the release of the vessel (if arrested) the Charterers are to indemnify the Owners for all costs and expenses incurred in providing such bond or other security as well as provide commensurate counter security and laytime shall continue to count through any delay whatsoever.**

(Hereinafter, the "**Short-Landing Indemnity Clause**")(Emphasis added).

18.    Pursuant to the terms of the Charter Party, the Vessel completed loading cargoes of corn gluten feed and soybean products in Darrow, Louisiana on or about July 5, 2015, shipped by Defendant AU Multi.

19.    The Vessel discharged certain of the cargoes at Ponta Delgada, Portugal commencing on July 24, 2015 and then sailed for Casablanca, Morocco.

20.    The Vessel commenced discharging all remaining cargoes at Casablanca, Morroco on August 2, 2015.

21.    In the course of the cargo discharge at Casablanca, on August 6, 2015, the Stevedore appointed by Defendant AU Savannah caused substantial and material damage to the ship's crane, for which the Defendant AU Savannah is responsible pursuant to clause 5(c) of the Charter Party, and for which Defendant AU Dubai is responsible as the guarantor of AU Savannah's performance.

22.    During the course of the cargo discharge at Casablanca, on August 7, 2015, Defendants AU Dubai and AU Afrique claimed to be subrogated to the rights of Vessel charterer

5

Defendant AU Savannah and then wrongfully caused the arrest of the Vessel at Casablanca, purportedly to secure claims in the amount of approximately $170,000 for alleged delays, dispatch and cost savings accrued to Owners in the course of the voyage, which event is hereinafter referred to as the "**First Arrest.**"  The First Arrest and subsequent refusal to arbitrate the claims in London is a breach of clause 19(a) of the Charter Party, which requires all disputes to be resolved by arbitration in London.

23.     The Plaintiff immediately contacted Defendant AU Dubai to remind them of the terms of the Charter Party, to negotiate the immediate release of the Vessel, and to notify them that AU Dubai would be responsible for all damages arising from the First Arrest and the wrongful refusal to arbitrate the claims in London.

24.     The Vessel completed the cargo discharge at 11 p.m. local time on August 7, 2015, and was thereafter detained and delayed at the demurrage rate of $10,000 per day, chargeable to the Defendant AU Savannah, its alter egos AU Multi and AU North America, and to the Defendants AU Dubai and AU Afrique who claimed to be subrogated to the rights of AU Savannah and thereby caused the First Arrest, which has not been lifted.

25.     On August 11, 2015, Plaintiff wired $200,000 to the trust account of its counsel in the United Kingdom to be immediately available to be placed in escrow as security for the claims asserted by Defendants AU Dubai and AU Afrique to be resolved by arbitration in London.

26.     Although by email dated August 10, 2015 Defendants AU Dubai and AU Afrique agreed to the escrow of the Plaintiff's funds in the United Kingdom, they later wrongfully refused to enter in an escrow agreement and rebuffed all attempts by the Plaintiff to negotiate the release of the Vessel in good faith.

27.     On August 11, 2015, Defendants AU Dubai and AU Afrique wrongfully caused the arrested Vessel at Casablanca to be arrested a *second* time, purportedly to secure a claim of approximately $40,000 for an alleged short-landing of cargo, which event is hereinafter referred to as the "**Second Arrest**".  The Second Arrest is a breach of the Short-Landing Indemnity Clause of the Recap and clause 19(a) of the Charter Party, which requires all disputes to be resolved by arbitration in London.

28.     The Defendants refused Plaintiff's entreaties to cause the Second Arrest to be lifted and to arbitrate that underlying claim in London, as well.  Demurrage on the Vessel continued to accrue against the Defendants at a rate of $10,000 per day from August 7th at 11 p.m. local time to her release on August 28, 2015.

29.     Prior to the First Arrest and Second Arrest, the Plaintiff had entered into an agreement with Lebanon Chemicals Company SAL, of Beirut, Lebanon ("**Lebanon Chemicals**") for Lebanon Chemicals to enter into a 15.1-day voyage charter party for the Vessel, to commence loading at Casablanca not later than 11:59 p.m. on August 11th.

30.     As a result of the First Arrest and Second Arrest, Lebanon Chemicals procured alternative tonnage and cancelled the voyage charter with the Plaintiff, causing Plaintiff to suffer damages.

## For a First Cause of Action Against All Defendants
### (Compelling Arbitration)

31.     As a result of Defendants wrongful actions, Plaintiffs are seeking the following damages for the Defendants in a pending London Arbitration pursuant to the terms of the Charter Party:

| | | |
|---|---|---|
| Stevedoring Damages | | $40,000.00 |
| Indemnity for Short-landing | | $47,651.00 |
| Detention of the Vessel | | $220,000.00 |
| Loss of Next Fixture | | $203,500.00 |
| Demurrage | | $34,198.00 |
| | TOTAL: | $545,349.00 |

32.     Clause 19(a) of the Charter Party is a written provision in a maritime transaction to settle by arbitration a controversy thereafter arising out of such transaction, and is valid and enforceable under the FAA.

33.     The Plaintiff is entitled to have the above-described disputes resolved in a London arbitration in accordance with Clause 19(a) of the Charter Party, with this Court retaining jurisdiction to enter its decree upon the awards issued therein, and is further entitled to security for the claims they seek to have arbitrated.

## For a Second Cause of Action Against All Defendants
### (Breach of Charter Party and Wrongful Arrest of Vessel)

34.     Plaintiff repeats and reasserts all preceding allegations as if set forth herein verbatim.

35.     The Defendants working in concert have caused the First Arrest and Second Arrest of the Vessel and wrongfully refused to arbitrate the claims in London in breach of Clause 19(a) of the Charter Party and the Short-Landing Indemnity Clause of the Recap.

8

36.     As a result of the Defendants' breach, the Plaintiff has suffered damages in the amount of demurrage from 11 p.m. on August 7th to August 28, 2015 at the rate of $10,000 per day, together with the net income loss of $203,419 from the potential loss of the Lebanon Chemicals voyage charter, as well as approximately $25,000 in additional expenses incurred for anchorage fees, pilotage for shifting the Vessel and launch expenses while the Vessel has been wrongfully detained under the First Arrest and Second Arrest caused by the Defendants as part of Defendants' refusal to arbitrate their alleged claims in London.

### For a Third Cause of Action Against AU Savannah and AU Dubai
### (Breach of Charter Party Stevedore Damage)

37.     Plaintiff repeats and reasserts all preceding allegations as if set forth herein verbatim.

38.     The Defendants appointed stevedores to discharge the cargo at Casablanca, and the stevedores caused damage to the ship's crane in the amount of approximately $40,000.

39.     The Charter Party at clause 5(c) provides the "Charterers [Defendant AU Savannah] shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores."

40.     The Charter Party Recap provides that Defendant AU Dubai has "fully guaranteed" the performance of AU Savannah's obligations under the Charter Party.

41.     As a result of this breach by AU Savannah and AU Dubai, Plaintiff has suffered damages in the amount of $40,000.

**For a Fourth Cause of Action Against AU Savannah and AU Dubai**
**(Breach of Charter Party – Countersecurity)**

42.     Plaintiff repeats and reasserts all preceding allegations as if set forth herein verbatim.

43.     Defendant AU Savannah, as Charterer, and Defendant AU Dubai, as guarantor, are obligated by the terms of the Short-Landing Indemnity Clause to post counter-security for the alleged shortage claim that is the purported basis of the Second Arrest.

44.     Defendants AU Savannah and AU Dubai have wrongfully refused to post counter-security and are thereby in breach of the Charter Party, and Plaintiff has suffered damages as a result.

**For a Fifth Cause of Action Against AU Dubai and AU Afrique**
**(Maritime Attachment)**

45.     Defendants cannot be found in this District.

46.     Upon information and belief, Defendants have property in the district, including, without limitation, a cargo of goods aboard Barge TRL 433 expected to be loaded on the M/V SCL BASILISK at the Impala Terminals Burnside located at Mile Marker 169.7 E.

47.     Plaintiff is entitled, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and 9 U.S.C.A. § 8, to attachment and garnishment of the assets of Defendants AU Dubai and AU Afrique to secure its claims for demurrage, stevedore damage, breach of party, wrongful arrest, and the potential lost net revenue from the Lebanon Chemicals Charter party as a result of these Defendants' breaches, pending arbitration of the same.

**WHEREFORE**, Plaintiff Diligence Maritime, Ltd. prays:

1.     That process issue against Agribusiness United Savannah Logistics, LLC, Agribusiness Multi Commodities, Inc., Agribusiness United North America, Inc., Agribusiness United DMCC, Agribusiness United Afrique S.A.R.LAU (collectively "**Defendants**"), and that said Defendants be cited to appear and answer the allegations of this complaining;

2.     That if the Defendants cannot be found within this district, then all of their property, tangible or intangible assets, accounts, freights, sub-freights, hire payments monies, charter hire, credits, effects, CHIP credits, payments for bunkers, goods or services or rents, bills of lading, cargoes, debts and the like belonging to or claimed by Defendants be attached in the sum of FIVE HUNDRED FORTY FIVE THOUSAND, THREE HUNDRED FORTY NINE AND NO/100THS ($545,349) DOLLARS, together with interest thereupon;

3.     That the Defendants' tangible property be sold under the direction of the Court and the proceeds of the sale brought into the Court;

4.     That the Court, after issuance, service and execution of the process herein, direct all of the parties hereto to arbitration in accordance with the Charter Party, and retain jurisdiction to enter its decree upon the award, all as provided by 9 U.S.C.A. § 8;

5.     That the Plaintiff be awarded damages from Defendants in the amount of FIVE HUNDRED FORTY FIVE THOUSAND, THREE HUNDRED FORTY NINE AND NO/100THS ($545,349) DOLLARS, together with interest, costs, and attorneys' fees; and

6.     That Plaintiff may have such other and further relief as it may lawfully be entitled to receive.

11

Respectfully submitted,

 _/s/ T. Patrick O'Leary_
Andrew S. de Klerk (LA Bar No. 1045)
T. Patrick O'Leary (LA Bar No. 30665)
Brandon K. Thibodeaux (LA Bar No. 32725)
FRILOT L.L.C.
3800 Energy Centre; 1100 Poydras Street
New Orleans, LA  70163-3700
504/599-8010 Phone; 504/599-8110 Fax
adeklerk@frilot.com
poleary@frilot.com
bthibodeaux@frilot.com
**_Counsel for Defendant Diligence Maritime, Ltd._**

## DIRECTIONS FOR US MARSHALS SERVICE:

Please attach the cargo of corn gluten feed stored in Barge TRL 433 or M/V SCL BASILISK at the Impala Terminals Burnside, approximately Mile Marker 169.7, 4258

12

| 1. Shipbroker | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)<br>(To be used for trades for which no specially approved form is in force)<br>CODE NAME: "GENCON" | |
|---|---|---|
| | | Part I |
| | 2. Place and date | |
| 3. Owners/Place of business (Cl. 1) | 4. Charterers/Place of business (Cl. 1) | |
| 5. Vessel's name (Cl. 1) | 6. GT/NT (Cl. 1) | |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) | |
| 9. Expected ready to load (abt.) (Cl. 1) | | |
| 10. Loading port or place (Cl. 1) | 11. Discharging port or place (Cl. 1) | |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1) | | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4) | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4) | |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) | |
| 17. Shippers/Place of business (Cl. 6) | a) Laytime for loading | |
| 18. Agents (loading) (Cl. 6) | b) Laytime for discharging | |
| 19. Agents (discharging) (Cl. 6) | c) Total laytime for loading and discharging | |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7) | 21. Cancelling date (Cl. 9) | |
| | 22. General Average to be adjusted at (Cl. 12) | |
| 23. Freight Tax (state if for the Owners' account) (Cl. 13 (c)) | 24. Brokerage commission and to whom payable (Cl. 15) | |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19) | | |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) | 26. Additional clauses covering special provisions, if agreed | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen

**EXHIBIT**

**A**

tabbies

PART II

"Gencon" Charter (As Revised 1922, 1976 and 1994)

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:
The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

2. Owners' Responsibility Clause
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3. Deviation Clause
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. Payment of Freight
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.
(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost.
Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.
(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered.
Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.
Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.

5. Loading/Discharging
(a) Costs/Risks
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.
(b) Cargo Handling Gear
Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage. On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall

always work under the supervision of the Master.
(c) Stevedore Damage
The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.
The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

6. Laytime
*(a) Separate laytime for loading and discharging
The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
*(b) Total laytime for loading and discharging
The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.
If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.
Time used before commencement of laytime shall count.
* Indicate alternative (a) or (b) as agreed, in Box 16.

7. Demurrage
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.
In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.

8. Lien Clause
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9. Cancelling Clause
(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.
(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.
Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

the seventh day after the new readiness date stated in the Owners' notification 149
to the Charterers shall be the new cancelling date. 150
The provisions of sub-clause (b) of this Clause shall operate only once, and in 151
case of the Vessel's further delay, the Charterers shall have the option of 152
cancelling the Charter Party as per sub-clause (a) of this Clause. 153

**10. Bills of Lading** 154
Bills of Lading shall be presented and signed by the Master as per the 155
"Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter 156
Party, or by the Owners' agents provided written authority has been given by 157
Owners to the agents, a copy of which is to be furnished to the Charterers. The 158
Charterers shall indemnify the Owners against all consequences or liabilities 159
that may arise from the signing of bills of lading as presented to the extent that 160
the terms or contents of such bills of lading impose or result in the imposition of 161
more onerous liabilities upon the Owners than those assumed by the Owners 162
under this Charter Party. 163

**11. Both-to-Blame Collision Clause** 164
If the Vessel comes into collision with another vessel as a result of the 165
negligence of the other vessel and any act, neglect or default of the Master, 166
Mariner, Pilot or the servants of the Owners in the navigation or in the 167
management of the Vessel, the owners of the cargo carried hereunder will 168
indemnify the Owners against all loss or liability to the other or non-carrying 169
vessel or her owners in so far as such loss or liability represents loss of, or 170
damage to, or any claim whatsoever of the owners of said cargo, paid or 171
payable by the other or non-carrying vessel or her owners to the owners of said 172
cargo and set-off, recouped or recovered by the other or non-carrying vessel 173
or her owners as part of their claim against the carrying Vessel or the Owners. 174
The foregoing provisions shall also apply where the owners, operators or those 175
in charge of any vessel or vessels or objects other than, or in addition to, the 176
colliding vessels or objects are at fault in respect of a collision or contact. 177

**12. General Average and New Jason Clause** 178
General Average shall be adjusted in London unless otherwise agreed in Box 179
22 according to York-Antwerp Rules 1994 and any subsequent modification 180
thereof. Proprietors of cargo to pay the cargo's share in the general expenses 181
even if same have been necessitated through neglect or default of the Owners' 182
servants (see Clause 2). 183
If General Average is to be adjusted in accordance with the law and practice of 184
the United States of America, the following Clause shall apply: "In the event of 185
accident, danger, damage or disaster before or after the commencement of the 186
voyage, resulting from any cause whatsoever, whether due to negligence or 187
not, for which, or for the consequence of which, the Owners are not 188
responsible, by statute, contract or otherwise, the cargo shippers, consignees 189
or the owners of the cargo shall contribute with the Owners in General Average 190
to the payment of any sacrifices, losses or expenses of a General Average 191
nature that may be made or incurred and shall pay salvage and special charges 192
incurred in respect of the cargo. If a salving vessel is owned or operated by the 193
Owners, salvage shall be paid for as fully as if the said salving vessel or vessels 194
belonged to strangers. Such deposit as the Owners, or their agents, may deem 195
sufficient to cover the estimated contribution of the goods and any salvage and 196
special charges thereon shall, if required, be made by the cargo, shippers, 197
consignees or owners of the goods to the Owners before delivery.". 198

**13. Taxes and Dues Clause** 199
(a) *On Vessel* -The Owners shall pay all dues, charges and taxes customarily 200
levied on the Vessel, howsoever the amount thereof may be assessed. 201
(b) *On cargo* -The Charterers shall pay all dues, charges, duties and taxes 202
customarily levied on the cargo, howsoever the amount thereof may be 203
assessed. 204
(c) *On freight* -Unless otherwise agreed in Box 23, taxes levied on the freight 205
shall be for the Charterers' account. 206

**14. Agency** 207
In every case the Owners shall appoint their own Agent both at the port of 208
loading and the port of discharge. 209

**15. Brokerage** 210
A brokerage commission at the rate stated in Box 24 on the freight, dead-freight 211
and demurrage earned is due to the party mentioned in Box 24. 212
In case of non-execution 1/3 of the brokerage on the estimated amount of 213
freight to be paid by the party responsible for such non-execution to the 214
Brokers as indemnity for the latter's expenses and work. In case of more 215
voyages the amount of indemnity to be agreed. 216

**16. General Strike Clause** 217
(a) If there is a strike or lock-out affecting or preventing the actual loading of the 218
cargo, or any part of it, when the Vessel is ready to proceed from her last port or 219

at any time during the voyage to the port or ports of loading or after her arrival 220
there, the Master or the Owners may ask the Charterers to declare, that they 221
agree to reckon the laydays as if there were no strike or lock-out. Unless the 222
Charterers have given such declaration in writing (by telegram, if necessary) 223
within 24 hours, the Owners shall have the option of cancelling this Charter 224
Party. If part cargo has already been loaded, the Owners must proceed with 225
same, (freight payable on loaded quantity only) having liberty to complete with 226
other cargo on the way for their own account. 227
(b) If there is a strike or lock-out affecting or preventing the actual discharging 228
of the cargo on or after the Vessel's arrival at or off port of discharge and same 229
has not been settled within 48 hours, the Charterers shall have the option of 230
keeping the Vessel waiting until such strike or lock-out is at an end against 231
paying half demurrage after expiration of the time provided for discharging 232
until the strike or lock-out terminates and thereafter full demurrage shall be 233
payable until the completion of discharging, or of ordering the Vessel to a safe 234
port where she can safely discharge without risk of being detained by strike or 235
lock-out. Such orders to be given within 48 hours after the Master or the 236
Owners have given notice to the Charterers of the strike or lock-out affecting 237
the discharge. On delivery of the cargo at such port, all conditions of this 238
Charter Party and of the Bill of Lading shall apply and the Vessel shall receive 239
the same freight as if she had discharged at the original port of destination, 240
except that if the distance to the substituted port exceeds 100 nautical miles, 241
the freight on the cargo delivered at the substituted port to be increased in 242
proportion. 243
(c) Except for the obligations described above, neither the Charterers nor the 244
Owners shall be responsible for the consequences of any strikes or lock-outs 245
preventing or affecting the actual loading or discharging of the cargo. 246

**17. War Risks ("Voywar 1993")** 247
(1) For the purpose of this Clause, the words: 248
(a) The "Owners" shall include the shipowners, bareboat charterers, 249
disponent owners, managers or other operators who are charged with the 250
management of the Vessel, and the Master; and 251
(b) "War Risks" shall include any war (whether actual or threatened), act of 252
war, civil war, hostilities, revolution, rebellion, civil commotion, warlike 253
operations, the laying of mines (whether actual or reported), acts of piracy, 254
acts of terrorists, acts of hostility or malicious damage, blockades 255
(whether imposed against all Vessels or imposed selectively against 256
Vessels of certain flags or ownership, or against certain cargoes or crews 257
or otherwise howsoever), by any person, body, terrorist or political group, 258
or the Government of any state whatsoever, which, in the reasonable 259
judgement of the Master and/or the Owners, may be dangerous or are 260
likely to be or to become dangerous to the Vessel, her cargo, crew or other 261
persons on board the Vessel. 262
(2) If at any time before the Vessel commences loading, it appears that, in the 263
reasonable judgement of the Master and/or the Owners, performance of 264
the Contract of Carriage, or any part of it, may expose, or is likely to expose, 265
the Vessel, her cargo, crew or other persons on board the Vessel to War 266
Risks, the Owners may give notice to the Charterers cancelling this 267
Contract of Carriage, or may refuse to perform such part of it as may 268
expose, or may be likely to expose, the Vessel, her cargo, crew or other 269
persons on board the Vessel to War Risks; provided always that if this 270
Contract of Carriage provides that loading or discharging is to take place 271
within a range of ports, and at the port or ports nominated by the Charterers 272
the Vessel, her cargo, crew, or other persons onboard the Vessel may be 273
exposed, or may be likely to be exposed, to War Risks, the Owners shall 274
first require the Charterers to nominate any other safe port which lies 275
within the range for loading or discharging, and may only cancel this 276
Contract of Carriage if the Charterers shall not have nominated such safe 277
port or ports within 48 hours of receipt of notice of such requirement. 278
(3) The Owners shall not be required to continue to load cargo for any voyage, 279
or to sign Bills of Lading for any port or place, or to proceed or continue on 280
any voyage, or on any part thereof, or to proceed through any canal or 281
waterway, or to proceed to or remain at any port or place whatsoever, 282
where it appears, either after the loading of the cargo commences, or at 283
any stage of the voyage thereafter before the discharge of the cargo is 284
completed, that, in the reasonable judgement of the Master and/or the 285
Owners, the Vessel, her cargo (or any part thereof), crew or other persons 286
on board the Vessel (or any one or more of them) may be, or are likely to be, 287
exposed to War Risks. If it should so appear, the Owners may by notice 288
request the Charterers to nominate a safe port for the discharge of the 289
cargo or any part thereof, and if within 48 hours of the receipt of such 290
notice, the Charterers shall not have nominated such a port, the Owners 291
may discharge the cargo at any safe port of their choice (including the port 292
of loading) in complete fulfilment of the Contract of Carriage. The Owners 293
shall be entitled to recover from the Charterers the extra expenses of such 294
discharge and, if the discharge takes place at any port other than the 295
loading port, to receive the full freight as though the cargo had been 296

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

carried to the discharging port and if the extra distance exceeds 100 miles, 297
to additional freight which shall be the same percentage of the freight 298
contracted for as the percentage which the extra distance represents to 299
the distance of the normal and customary route, the Owners having a lien 300
on the cargo for such expenses and freight. 301

(4) If at any stage of the voyage after the loading of the cargo commences, it 302
appears that, in the reasonable judgement of the Master and/or the 303
Owners, the Vessel, her cargo, crew or other persons on board the Vessel 304
may be, or are likely to be, exposed to War Risks on any part of the route 305
(including any canal or waterway) which is normally and customarily used 306
in a voyage of the nature contracted for, and there is another longer route 307
to the discharging port, the Owners shall give notice to the Charterers that 308
this route will be taken. In this event the Owners shall be entitled, if the total 309
extra distance exceeds 100 miles, to additional freight which shall be the 310
same percentage of the freight contracted for as the percentage which the 311
extra distance represents to the distance of the normal and customary 312
route. 313

(5) The Vessel shall have liberty:- 314
(a) to comply with all orders, directions, recommendations or advice as to 315
departure, arrival, routes, sailing in convoy, ports of call, stoppages, 316
destinations, discharge of cargo, delivery or in any way whatsoever which 317
are given by the Government of the Nation under whose flag the Vessel 318
sails, or other Government to whose laws the Owners are subject, or any 319
other Government which so requires, or any body or group acting with the 320
power to compel compliance with their orders or directions; 321
(b) to comply with the orders, directions or recommendations of any war 322
risks underwriters who have the authority to give the same under the terms 323
of the war risks insurance; 324
(c) to comply with the terms of any resolution of the Security Council of the 325
United Nations, any directives of the European Community, the effective 326
orders of any other Supranational body which has the right to issue and 327
give the same, and with national laws aimed at enforcing the same to which 328
the Owners are subject, and to obey the orders and directions of those who 329
are charged with their enforcement; 330
(d) to discharge at any other port any cargo or part thereof which may 331
render the Vessel liable to confiscation as a contraband carrier; 332
(e) to call at any other port to change the crew or any part thereof or other 333
persons on board the Vessel when there is reason to believe that they may 334
be subject to internment, imprisonment or other sanctions; 335
(f) where cargo has not been loaded or has been discharged by the 336
Owners under any provisions of this Clause, to load other cargo for the 337
Owners' own benefit and carry it to any other port or ports whatsoever, 338
whether backwards or forwards or in a contrary direction to the ordinary or 339
customary route. 340
(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this 341
Clause anything is done or not done, such shall not be deemed to be a 342
deviation, but shall be considered as due fulfilment of the Contract of 343
Carriage. 344

18. General Ice Clause 345
Port of loading 346
(a) In the event of the loading port being inaccessible by reason of ice when the 347
Vessel is ready to proceed from her last port or at any time during the voyage or 348
on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the 349
Master for fear of being frozen in is at liberty to leave without cargo, and this 350
Charter Party shall be null and void. 351
(b) If during loading the Master, for fear of the Vessel being frozen in, deems it 352
advisable to leave, he has liberty to do so with what cargo he has on board and 353
to proceed to any other port or ports with option of completing cargo for the 354
Owners' benefit for any port or ports including port of discharge. Any part 355
cargo thus loaded under this Charter Party to be forwarded to destination at the 356
Vessel's expense but against payment of freight, provided that no extra 357
expenses be thereby caused to the Charterers, freight being paid on quantity 358
delivered (in proportion if lumpsum), all other conditions as per this Charter 359
Party. 360
(c) In case of more than one loading port, and if one or more of the ports are 361
closed by ice, the Master or the Owners to be at liberty either to load the part 362
cargo at the open port and fill up elsewhere for their own account as under 363
section (b) or to declare the Charter Party null and void unless the Charterers 364
agree to load full cargo at the open port. 365

Port of discharge 366
(a) Should ice prevent the Vessel from reaching port of discharge the 367
Charterers shall have the option of keeping the Vessel waiting until the re- 368
opening of navigation and paying demurrage or of ordering the Vessel to a safe 369
and immediately accessible port where she can safely discharge without risk of 370
detention by ice. Such orders to be given within 48 hours after the Master or the 371
Owners have given notice to the Charterers of the impossibility of reaching port 372

of destination. 373
(b) If during discharging the Master for fear of the Vessel being frozen in deems 374
it advisable to leave, he has liberty to do so with what cargo he has on board and 375
to proceed to the nearest accessible port where she can safely discharge. 376
(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall 377
apply and the Vessel shall receive the same freight as if she had discharged at 378
the original port of destination, except that if the distance of the substituted port 379
exceeds 100 nautical miles, the freight on the cargo delivered at the substituted 380
port to be increased in proportion. 381

19. Law and Arbitration 382
* (a) This Charter Party shall be governed by and construed in accordance with 383
English law and any dispute arising out of this Charter Party shall be referred to 384
arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or 385
any statutory modification or re-enactment thereof for the time being in force. 386
Unless the parties agree upon a sole arbitrator, one arbitrator shall be 387
appointed by each party and the arbitrators so appointed shall appoint a third 388
arbitrator, the decision of the three-man tribunal thus constituted or any two of 389
them, shall be final. On the receipt by one party of the nomination in writing of 390
the other party's arbitrator, that party shall appoint their arbitrator within 391
fourteen days, failing which the decision of the single arbitrator appointed shall 392
be final. 393
For disputes where the total amount claimed by either party does not exceed 394
the amount stated in Box 25** the arbitration shall be conducted in accordance 395
with the Small Claims Procedure of the London Maritime Arbitrators 396
Association. 397
* (b) This Charter Party shall be governed by and construed in accordance with 398
Title 9 of the United States Code and the Maritime Law of the United States and 399
should any dispute arise out of this Charter Party, the matter in dispute shall be 400
referred to three persons at New York, one to be appointed by each of the 401
parties hereto, and the third by the two so chosen; their decision or that of any 402
two of them shall be final, and for purpose of enforcing any award, this 403
agreement may be made a rule of the Court. The proceedings shall be 404
conducted in accordance with the rules of the Society of Maritime Arbitrators, 405
Inc.. 406
For disputes where the total amount claimed by either party does not exceed 407
the amount stated in Box 25 the arbitration shall be conducted in accordance 408
with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, 409
Inc.. 410
* (c) Any dispute arising out of this Charter Party shall be referred to arbitration at 411
the place indicated in Box 25, subject to the procedures applicable there. The 412
laws of the place indicated in Box 25 shall govern this Charter Party. 413
(d) If Box 25 in Part 1 is not filled in, sub-clause (a) of this Clause shall apply. 414
* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25. 415
** Where no figure is supplied in Box 25 in Part 1, this provision only shall be void but 416
the other provisions of this Clause shall have full force and remain in effect. 417

| | |
|---|---|
| From: | Gabriel Bec <gb@aecarriers.com> |
| Sent: | Thursday, June 25, 2015 17:20 |
| To: | 'AEC Reports'; operations@aecarriers.com |
| Subject: | INTERNAL RECAP AEC DILIGENCE / AGRO BUSINESS - CP DD 25 JUNE 2015 |
| Attachments: | VESSEL OWNERSBROKERSCP DATE.xlsx.pdf; 11. SMC Full Term.pdf; AEC DILIGENCE H&M for Charts 14-15.pdf; CERTIFICATE OF CLASSIFICATION.PDF; ISCC.PDF; AEC Diligence (wef 20.02.2015).pdf; 5. DOC SEAQUEST doo - Full Term - Exp 14 March 2019.pdf; wks_MA_24068.pdf |

Filed on the Cloud

**From:** Gabriel Bec [mailto:chartering@aecarriers.com]
**Sent:** 25 June 2015 22:06
**To:** h.benchaara@nobleshipping.ma
**Cc:** 'Gabriel Bec'; 'Jesper Lollesgaard'; 'Claas Grafe'; 'Lars-Peter Madsen'; chartering@aecarriers.com
**Subject:** M/V AEC DILIGENCE / AGRO BUSINESS - CLEAN FIXTURE RECAP

Hassan / Gabriel

Well received charterers confirmation that subs were lifted, we are therefore clean fixed.

Please find here below clean recap of fixture dated 25 june 2015

Negos and fixture to remain P&C

AEC DILIGENCE
32,189MT DWAT ON 10.55M SSW – TPC 41.09
(32,872MT DWAT ON 10.717M TIMBER)
BAHAMAS FLAG
BUILT APRIL JAPAN 2002, SAIKI HEAVY INDUSTRIES, JAPAN
DOUBLE HULL/BOX/OPEN HATCH/FULLY FITTED LOGGER
LOA 171.59M / BEAM 27.05M
5 HOLDS/5 HATCHES
GRAIN 40,323 CBM / BALE 39,839 CBM
4 X 30.5MT CRANES
GRT 19,882 / NRT 10,780
$CO_2$ FITTED IN HOLDS
BOX HOLD/OPEN HATCH
ADA

Open Mississipi River abt 26-28 july

Please find attached vessel certificates

For Account:
**Agribusiness United Savannah logistics LLC**

1

2 E Bryan St
11th floor
31401 Savannah
Ga, United States of Amrerica

**Fully guaranteed by Agribusiness United DMCC, Dubai UAE**

1/ Cargo: Up to F&C in chopt Combo of Soya Bean Meal + HSS + Corn Gluten Feed Pellet (limited to UN 1386 a) + DDGS (limited to UN 1386 a)
Grade breakdown/quantity to be at chrtrs option
Cargo grades to be naturally segregated by vessel's holds, should any artificial separation be required, same to be done at charterers time, expenses and responsibility

2/ Loading port: 1sb-sa Miss River nabi Baton Rouge

3/ Discharging port: 1sb 1sp Ponta Delgada + 1sb 1sp Casablanca

4/ Load/Disch terms: 8000 satpmshex eiu / 4000 satpmshex eiu

5/ Laycan: 27 june-2 july 2015

6/ NOR/Time counting: Gencon NOR / time counting clause to apply bends

7/ Freight: usd 880.000 Lumpsum

8/ Demurrage: usd 10.000 pdpr / dhdwtsbends

9/ Charterers reconfirmation – All in order

10/ Owners approval of charterers – All in order

11/ 3.75 Addcom + 1.25 brokerage to Noble Shipping

12/ Sub details as per attached Gencon 1994 proforma C/P logically amended as per main terms agreed with following alterations:

Part I
-Clause 12: insert "Up to a full and complete cargo in Charterers Option of Soya Bean Meal and/or Soya Beans and/or Corn Gluten Feed Pellets. See also Clause 20 of attached Riders"
-Clause 18: insert "Messrs T Parker Host, New Orleans"
-Clause 19: insert "Noble Shipping, Casablanca"
-Clause 20: insert "Demurrage shall be payable day by day if so requested by Owners"

Part II
-Clause 4: Lines 40 to 46 - Deleted
-Clause 6:
(a)
Line 92 before "Sundays" insert "1200hrs Saturday Noon,"
Line 93 amend "Unless" to read "Even" and delete ", in which even time used shall count."
Line 95 before "Sundays" insert "1200hrs Saturday Noon,"

(b) – delete

(c)
Line 102 amend "13:00" to read "15:00"
Line 103 amend "06:00" to read "08:00"
Line 108 after "Box 19." Insert "It is specifically agreed that the vessel is allowed to tender NOR weather already passed by USDA/NCB/Port Warden or similar/local Inspector or not"
Line 112 after "or not" insert "weather in port or not, weather in berth or not"

-Clause 19: Delete from line 398 to end of Clause

Additional Clauses (Riders)

-Clause 20: Further to clause 12 of Part I of this Charter Party it is agreed that cargoes permitted shall be either classed as "Seed Cake (Non Hazardous) Group C" or as "Seed Cake UN 1386 (a)" and that if requested Charterers or their Shippers will furnish Master with a MSDS in evidence thereof prior to commencement of loading.

-Clause 21:
Freight and Bill of Lading Clause
100% freight is payable less address commission only latest within 3 banking days
Of signing/releasing original Bills of Lading marked "Freight Payable as per Charter
Party Dated XX. All terms and conditions including but not limited to the Law and
Arbitration Clause and the Lien Clause of Charter Party Dated XX is herewith
Incorporated and shall apply hereto."

Freight shall be paid direct to Owners bank account as detailed in Owners freight
invoice.

-Clause 22:
Sanctions Clause
CHARTERERS REPRESENTS AND GUARANTEES: (I) THAT NEITHER THEY NOR ANY
AGENT, RECEIVER, CONSIGNE, STEVEDORE OR OTHER PERSON OR ENTITY THAT
DURING THIS VOYAGE WILL ON CHARTERERS OR THEIR AGENTS BEHALF COME
INTO CONTACT WITH THE VESSEL AND/OR THE CARGO  IS SANCTIONED UNDER THE
U.S., ENGLISH, EUROPEAN UNION OR SWISS ECONOMIC SANCTIONS LAWS RELATING
TO TRANSACTIONS WITH RESTRICTED COUNTRIES, PERSONS AND ENTITIES (THE
"SANCTIONS LAWS") AND ARE NOT LISTED ON THE U.S. OFFICE OF FOREIGN
ASSETS CONTROL'S ("OFAC") SDN LIST, THE U.S. BUREAU OF INDUSTRY AND
SECURITY'S ("BIS") LISTS, OR THE ENGLISH, EUROPEAN UNION OR SWISS
SANCTIONED PARTY LISTS; (II) THAT THEY (ANY OF THE AFOREMENTIONED) ARE
NOT REGISTERED IN AND ARE NOT IN ANY WAY, DIRECTLY OR
INDIRECTLY OWNED, CONTROLLED BY, OR RELATED TO ANY CUBAN, IRANIAN,
IRAQI, SUDANESE, NORTH KOREAN, SYRIAN INTERESTS, OR TO ANY COUNTRY,
PERSON OR ENTITY THAT MAY CAUSE OWNERS OR ANY PERSON SUBJECT TO
U.S./EU/SWISS/BRAZILIAN JURISDICTION TO BE IN VIOLATION OF OR
PENALIZED BY ANY SANCTIONS LAWS.

-Clause 23
Cargo Grades and Trim
Cargo grades shall be separated by means of natural separations. Subject to Owners prior approval Charterers may be allowed to build artificial separation in the vessels holds at their entire time risk and expense. Vessel always to be left in seaworthy trim to Master's satisfaction if shifting between ports or berths.

-Clause 24

Out Turn Weight and Shortage Claims

If the vessel discharges are more than one discharge port then the vessel not to responsible for the split of cargo out turn for each individual port but only for the overall out turned quantity. It is further agreed that in case of the vessel discharging in North African ports including but not limited to Morocco, Algeria, Tunisia and Egypt then the Owners shall not be responsible for short landing claims whatsoever. In the event that the Owners this clause not withstanding should be required to provide a bond or other security in order to prevent delay or arrest of the vessel or to secure the release of the vessel (if arrested) the Charterers are to indemnify the Owners for all costs and expenses incurred in providing such bond or other security as well as provide commensurate counter security and laytime shall continue to count through any delay whatsoever.

END RECAP


Reverting with notice on fixing

*Brgds*

*Gabriel Bec*

*Business:*  +44 (0) 207-193-4042
Cell:        +44 (0) 751-523-4345

*E-mail:*    Chartering@AECarriers.com
*Web-site:* www.AECarriers.com

*For and on behalf of*

**AEC**
Agriculture & Energy
Carriers